IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CT-03362-M

JOHN H. WRIGHT, Administrator of the )
Estate of Chad E. Price, )
)
Plaintiff, )
)                                         ORDER
v. )
)
GRANVILLE COUNTY, et al., )
)
Defendants. )

This cause is before the court on defendants' pending motion for summary judgment.

Mot. [D.E. 72].    For the reasons discussed below, the court grants the motion.

Relevant Procedural History:

On December 7, 2020, John H. Wright ("plaintiff"), Administrator of the Estate of Chad

E. Price ("Price" or "decedent"), proceeding *in forma pauperis*, filed a counseled civil rights case

arising out of Price's death.    See [D.E. 1, 2, 4].    Plaintiff names as defendants: Granville County;

former Granville County Sheriff Brindell B. Wilkins, Jr. ("Wilkins") in his official and individual

capacities; Granville County Sheriff Charles Royster Noblin, Jr. ("Noblin") in his official capacity;

Western Surety Company ("Western Surety"); former Jail Administrator J.J. Hayes; present Jail

Administrator Edward Cash ("Cash"); Sergeant Sandra Overby Limerick ("Limerick"); Correction

Officer ("C.O.") Steven Hayes, Jr. ("Steven Hayes"); C.O. Harold Woody; C.O. Barika Lyons

("Lyons"); C.O. David Lamont ("Lamont"); C.O. Wade Woody; C.O. Johnny Evans ("Evans");

C.O. Teresa Robinson ("Robinson"); C.O. Alfred Carter ("Carter"); C.O. Alixzine Benson

("Benson"); and C.O. Bonny Hicks ("Hicks").    See Compl. [D.E. 1] at ¶¶4–20.

Plaintiff alleges, *inter alia*: Granville County was aware of a "growing public nuisance of opioid abuse." Id. at ¶¶21–24. Price illegally used heroin and, by 2018, was an addict. Id. at ¶25. On or about December 7, 2018, Granville County sheriffs were called to a location where Price and another individual were arrested after being discovered in "the burnt-out ruin of a house" with Price in possession of "several empty bindles of heroin." Id. at ¶¶28–29. During intake at the Granville County Detention Center ("Detention Center" or "GCDC") circa 3:30 p.m., Price told defendant Limerick "he was a user of heroin at the rate of 10 bags a day." Id. at ¶30. Limerick "made a notation in the Shift Log entry for December 7, 2018, at 15:30, that 'SD Harrison brought in Chad Price will need 96 HR.'" Id. Plaintiff contends, "this log notation discloses that Limerick was aware that upon admission to Detention Center, Price was substantially impaired, and required medical attention because of his intoxication and impairment from opioid use." Id. Sheriff Wilkins purportedly informed Mark Price, decedent's brother, that, at the time of intake, Wilkins "was aware that Price was intoxicated by opioids." Id. at ¶31. "At no time during Price's stay at Detention Center on December 7 and 8, 2018, did jail authorities permit Price access to any medical personnel or access to any treatment, or even assessment of his risks." Id. at ¶32. Price was assigned to a general population 10-man dormitory-style cell, and "not assigned medical or observation quarters or protocols." Id. at ¶33. Shortly after his admission to the Detention Center, Price "began to experience severe withdrawal agonies, writhing in pain, and frequently calling out for relief and medical assistance." Id. at ¶34. "Price experienced several bouts of seizures during the evening of December 7 and early morning December 8, 2018." Id. at ¶35. After "at least one seizure, Price requested medical attention" from unspecified jail officers, but "the officers failed and refused to contact any qualified medical providers or to allow Price access

2

to any medical attention." Id. at ¶¶35–36. Defendant Evans "reported that he walked through the facility with [defendant] Carter and inspected where inmate Price was located to make sure he was ok and 'noticed that he moved in the area.'" Id. at ¶37. Defendant Evans "also reported that he checked to make sure Price 'was still breathing as [Evans] knew [Price] was prescribed medication to combat withdrawal symptoms from opiods [sic].'" Id. No available medical records indicate that Price "ever consulted with any medical person," "ever was prescribed medication to 'combat withdrawal symptoms,'" or "was ever administered medication of any kind during his December 2018 stay the Detention Center." Id. at ¶¶38–39. Price's "agonies were so severe that the other men sharing the 10-man cell with him requested help for him several times" from unspecified "jail correctional officers," but these requests were ignored. Id. at ¶¶40–41. "Price himself requested medical assistance on several occasions by calling the central desk to request assistance on the intercom unit located near the door of the 10-man cell," but "none of Price's pleas for medical attention were heeded or even investigated." Id. at ¶¶42–43. Plaintiff contends that, at an unspecified time, unspecified "jail personnel administered some substance, which was not prescribed by any medically qualified persons, to Price." Id. at ¶44. "Price immediately vomited the substance," and unidentified correctional officers "helped clean some of the vomit, but nevertheless failed and refused to provide Price with access to medical attention." Id. "At approximately 9:00 a.m. on December 8, 2018, Price began experiencing severe seizures. Price's cell-mates immediately informed jail personnel that Price needed immediate medical attention." Id. at ¶45. "Limerick, Hicks, and Carter reported to the 10-man cell, where the extent of their assistance was only to laugh at Price and his condition, saying that all he needed was another fix." Id. at ¶46. "Price went limp and unconscious," but, "rather than administer

3

emergency first aid, such as Naloxone, Limerick, Hicks, and Carter simply directed a Trusty [sic] to lift Price into a wheelchair and transport Price out of the 10-man cell." Id. at ¶¶47–48. "A few minutes later, Limerick contacted Granville EMS and requested that Price be transported to Granville Medical ER." Id. at ¶49. At the Emergency Room, efforts to revive Price failed, and Price was pronounced deceased at approximately 10:00 a.m. on December 8, 2018. Id. at ¶50.

For relief, plaintiff seeks compensatory damages, court costs and attorney fees, punitive damages, interest on any award, a jury trial, and any further just and proper relief. Id. at 23.

On February 25, 2021, the court allowed the action to proceed. Order [D.E. 5].

On June 21, 2021, defendants moved to dismiss the complaint for failure to state a claim, Mot. [D.E. 45] (citing Fed. R. Civ. P. 12(b)(6)), and filed a memorandum in support, [D.E. 46].

On August 10, 2021, plaintiff filed a response in opposition. [D.E. 52].

On September 21, 2021, defendants filed a reply. [D.E. 56].

A November 4, 2021, text order reassigned this case to the undersigned judge. [D.E. 57].

On March 30, 2022, the court granted in part and denied in part the motion to dismiss, dismissed without prejudice Cash and J.J. Hayes as defendants, and dismissed plaintiff's fourth claim for relief, premised on the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and plaintiff's seventh claim for relief, premised on a state tort-law claim of intentional infliction of emotional distress ("IIED"). See Order [D.E. 58].

On May 18, 2022, Benson, Carter, Evans, Granville County, Steven Hayes, Hicks, Lamont, Limerick, Lyons, Noblin, Robinson, Western Surety Company, Wilkins, Harold Woody, and Wade Woody (collectively, "defendants") answered the complaint. Answer [D.E. 62].

4

On May 31, 2023, defendants filed a motion for summary judgment, Mot. [D.E. 72], a statement of material facts [D.E. 73], an appendix [D.E. 74], including the expert report of forensic toxicologist George W. Hime, M.S. ("Hime"), Ex. 13 [D.E. 74-13] at 1–19, and declarations of defendant Limerick, Ex. 1 [D.E. 74-1] at 2–13, Chief of Detention Facility and Courthouse Services Fred Robertson ("Robertson"), Ex. 2 [D.E. 74-2] at 2–16, Detective Mark Harrison ("Harrison"), Ex. 2B [D.E. 74-2] at 31–33, Granville County Commissioner Russell E. May, Sr., Ex. 4 [D.E. 74-4] at 2–4, defendant Carter, Ex. 8 [D.E. 74-8] at 2–5, and Detective Craig Williams, Ex. 14 [D.E. 74-14] at 2–4, a memorandum in support [D.E. 75], and a motion for leave to file video and audio exhibits, Mot. [D.E. 76].

The court granted the motion for leave to file video and audio exhibits. Order [D.E. 77].

On July 24, 2023, plaintiff filed a memorandum [D.E. 85], a response in opposition to defendants' motion for summary judgment [D.E. 86], including, *inter alia*, EMS Communications and Report, Ex. 3 [D.E. 86-4], a deposition of Hime, Ex. 4 [D.E. 86-5], the expert report of Clinical and Forensic Psychologist John McCoy, M.S., PhD, PLLC, ("Dr. McCoy"), Ex. 5 [D.E. 86-6], the declaration of decedent's daughter, Megan Price, Ex. 6 [D.E. 86-7], the affidavit of decedent's brother, Mark Price, Ex. 7 [D.E. 86-8], the affidavits of Detention Center detainees Travis D. Pergerson ("Pergerson"), Ex. 8 [D.E. 86-9], and Harith Whyche ("Whyche"), Ex. 9 [D.E. 86-10], and May 2018 Detention Center medical records for Price, Ex. 10 [D.E. 86-11], as well as a statement of material facts [D.E. 87].

On August 24, 2023, defendants filed a reply. Defs.' Reply [D.E. 90].

On December 12, 2023, the court ordered supplemental briefing addressing Short v. Hartman, 87 F.4th 593 (4th Cir. 2023) ("Short"). Order [D.E. 92].

5

On January 26, 2023, defendants filed a response and supplemental brief.    [D.E. 98].

On February 20, 2024, plaintiff filed a supplemental brief in response.    [D.E. 99].

On March 5, 2024, defendants filed a reply.    [D.E. 100].

Statement of Facts:

The facts are disputed as noted.   The decedent, Chad Price, was addicted to opioids, the Granville County Sheriff's Office was familiar with Price, and Price previously had been detained at the Detention Center.[1]   See Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶¶1–4.

The parties generally agree that, on the afternoon of December 7, 2018, Granville County Deputy Sheriff Harrison responded to a call from a homeowner of a burned-out residence regarding a breaking & entering in progress.   At the residence, Deputy Harrison detained Price and Pergerson as they came out of the building, questioned the men, and searched Price, finding, *inter alia*, multiple empty heroin packets/bindles on Price's person.   While being searched, Price indicated he thought he had a needle on his person, but Deputy Harrison did not find any needle. Deputy Harrison then bagged the drug paraphernalia and placed Price into the patrol vehicle. During a search of the house, a blue backpack was found that contained "a pill bottle, what is believed to be .10 grams of crystal methamphetamine and .25 grams of Heroin (ten bindles)" bearing the same markings as the bindles found on Price's person.   Pergerson granted permission

---

[1] Harrison declares: "I was familiar with Price prior to the date of the incident from prior arrests."   Defs.' App., Ex. 5, Harrison Decl. [D.E. 74-5] at ¶15.   Price's daughter declares: "The Sheriffs and other law enforcement officers in Granville County knew my dad, and they knew that he was addicted to opiates.   Dad had previously been arrested and detained in Granville County Detention Center before the time he died in their custody.   On the previous occasion, my father received medical attention for his addiction at the local hospital, I believe."   Pl.'s Ex. 6, Megan Price Decl. [D.E. 86-7] at ¶6.   Price's brother avers: "Officers of the Granville County Sheriff's Department knew Chad [Price], and were aware that he was addicted to heroin."   Pl.'s Ex. 7, Mark Price Aff. [D.E. 86-7] at ¶5.   The record includes a May 16, 2018, GCDC medical questionnaire, completed by Limerick and signed by Price, noting "yes" as to whether Price had even been treated for drug addiction and writing, "on 8 to 10 bags a day of heroin," with markings indicating Price received treatment for heroin withdrawal on May 17, 2018.   Pl.'s Ex. 10 [D.E. 86-11] at 2.

6

for a vehicle search where a few more empty bindles of heroin were found. Deputy Harrison transported Price to the Detention Center where he advised the jail staff that Price thought he had a needle on him which was not found during the search and asked staff to search Price carefully. See Defs.' Stmt. Mat. Facts [D.E. 73] at ¶¶21–25; Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶5.

At intake, Limerick searched Price and filled out a health screening forms.[2]  Price did not see any medical professional and was placed in a 10-man dormitory-style cell overnight.  See Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶¶5–6; Defs.' Stmt. Mat. Facts [D.E. 73] at ¶¶26–37.

The parties, however, disagree whether it was "obvious" that Price was "high" on drugs at the time of his arrest or booking,[3] and whether it was apparent that Price required medical

---

[2] The record includes medical questionnaire and a mental health screening form, both dated December 7, 2018, at 4:50 p.m. and 4:51 p.m., respectively, completed by Limerick and signed by Price.  See Defs.' App., Ex. 1C [D.E. 74-1] at 219 (medical questionnaire answering "yes" as to whether Price had ever been treated for drug addiction, with a notation "on Heroin 10 bags a day."); Id., Ex. 1D [D.E. 74-1] at 221 (mental health screening answering "yes" as to whether "the inmate appear[s] to be under the influence of drugs or alcohol," and writing, underneath, "on Heroin").

[3] Harrison declares: "On the date of the arrest, neither Price nor Pergerson seemed 'high' or severely intoxicated"; "Price carried on a conversation with [Harrison] throughout the search, arrest and transport"; and Harrison believes "Price's demeanor as described here as not being extremely intoxicated or excessively high is reflected on [Harrison's] body cam video[.]"  Defs.' App., Ex. 5, Harrison Decl. [D.E. 74-5] at ¶¶15–16.  Limerick declares: all officers at the Detention Center are "specifically required to 'be instructed in "Basic Jail Certification School" to detect signs, symptoms, and/or effects of severe alcohol and drug intoxication'"; Limerick completed the intake paperwork, including a preliminary health screening "asking about drug use, withdrawal symptoms, and other medical issues" that Price wanted to bring to Limerick's attention or that Limerick observed; "At the time of booking, Price advised that he was 'on Heroin 10 bags a day'"; "Although [Limerick] did not write that Price had not ingested any Heroin that day" on the health questionnaire, Limerick "specifically recalls" Price telling Limerick that Price "had not ingested Heroin before he arrived"; "Price did not appear to be under the influence of drugs when he arrived" at the Detention Center; Limerick visually inspected Price, and Price "did not appear to be under the influence of drugs" when he arrived; Limerick also did not "see any signs of severe intoxication"; Price "denied having taken substances"; no drugs or needles were located on Price during frisk search or expelled from his rectum after he was required to "squat and cough"; "Price was booked without incident"; Price "did not appear 'out of it,' or intoxicated"; Price "understood the questions that were asked of him and signed his intake paperwork"; on the mental health screening form, Limerick noted that Price was "on Heroin" because "Price was still a current Heroin user even if he had not used any that day, as he told" Limerick, but this notation "did not indicate that Mr. Price was 'high' or 'intoxicated' on Heroin at the time of his arrest, [but] only [indicated] that he was a user."  Id., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶¶17–18, 20–29.  Pergerson avers that: he has "struggled with opiate addiction"; "It was obvious that Chad was high from opioids when we were arrested and admitted to" the Detention Center; and, "because Chad was still high, he had not begun the withdrawal process."  Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶¶2–3.  Mark Price avers: "Sheriff Wilkins told me . . . that they could tell at the time of Chad's arrest on this occasion that he was strung out and needed a fix."  Pl.'s Ex. 7, Mark Price Aff. [D.E. 86-7] at ¶6.

7

treatment for drug intoxication or withdrawal.[4] <u>Compare</u> Defs.' Stmt. Mat. Facts [D.E. 73] at

¶¶26, 29, 34 (stating: at arrest, "neither Price nor Pergerson seemed 'high' or severely intoxicated";

"Price carried on a conversation with Harrison throughout the search, arrest and transport," Price

"did not appear 'out of it' or intoxicated"; and Price "also did not appear to be under the influence

of drugs when he arrived at the" Detention Center, "nor did he show any signs of severe

intoxication or other serious medical condition"), <u>with</u> Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at

¶¶5–6 (stating, "It was obvious that Price was high on drugs and would soon be withdrawing";

Limerick "did not make any notation that Price would be placed on withdrawal protocol," and

Price "never saw any medical professional of any kind").

    Plaintiff describes Price's purported sleep disturbances overnight from December 7 to 8,

2018, as follows: "Price, severely destressed at enduring unsupervised withdrawal, underwent a

---

[4] Limerick declares: Limerick visually inspected Price and "did not perceive that Mr. Price had any need of immediate medical care or mental health care when he arrived" or "observe any specific conditions or behaviors that indicated that immediate medical treatment was necessary"; Limerick "did not see any signs of severe intoxication or other serious medical condition"; if Limerick would have perceived that Price needed immediate medical care, Limerick would have "followed the policy and 'refused to accept custody' of Price"; "there were no indications of withdrawal or overdose during [Price's] admission"; Price "denied having taken substances" and "also denied suffering from withdrawal"; Price "did not express concerns about overdosing or otherwise show symptoms of an overdose upon" arrival at the Detention Center; Price "did not exhibit any symptoms of severe withdrawal or severe overdose, including any noticeable sweating, audible groans, dizziness, lack of consciousness or semi-consciousness, or any other symptoms that indicated to [Limerick] that he was withdrawing or suffering an overdose"; and Limerick's notation of "will need 96 HR" refers to the need for Price to have a first appearance before a judge within 96 hours of his admission pursuant to N.C. Gen. Stat. § 15A-601(c), and did not have anything to do with Price's medical or mental health status; and Limerick "did not see any need for Mr. Price to be housed in medical or observation quarters." Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶¶19–23, 25–29. Pergerson avers: he and Price were assigned to the same 10-man cell; Price "soon became severely distressed as he realized that he would be going through the terrors of withdrawal in that jail"; although Pergerson has struggled with opioid addiction, he "was clean" and "did not suffer withdrawal the way [Price] did"; the Detention Center "offered no services or facilities for withdrawal at all"; to his knowledge, "there was not a nurse on duty"; "none of the staff appeared to be trained on what to do for someone going through withdrawal"; "the inmates were simply left to suffer through withdrawal without any assistance of any kind"; and "corrections officers might offer a Gatorade to a withdrawing inmate, but not always." Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶¶3–4. Fellow Detention Center inmate Harith Whyche ("Whyche") avers, <i>inter alia</i>: he was an in the same 10-man cell where Price was admitted the day before he died; "Chad Price came in dope sick, withdrawing from heroin"; "The jailers knew as well as anyone that Chad Price was going through withdrawal"; "People frequently come into the jail in Granville County who are going through withdrawal"; "At one time, the jailers would give Gatorade or something like that to confines who are going through withdrawal, because it helps a little bit"; and "I do not recall the jailers giving Gatorade to Chad Price." <u>Id.</u>, Ex. 9, Whyche Aff. [D.E. 86-10] at ¶¶2–4.

8

fitful night . . . causing his dormmates to move him from his assigned top bunk to the floor because he was so fretful, restless and agitated that he was unable to stay still"; "Price's behavior disturbed his dormmates to the extent that they requested medical assistance for him by pressing the intercom . . . hoping for sleep"; "Jail personnel were unresponsive"; and "Price suffered several small seizures during the night."[5] See Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶7.

As to Price's purported sleep disturbances, a Jail Incident Report regarding the morning of December 8, 2018, was completed by defendant Lyons circa January 1, 2019, and states:

> On 12/8/2018[,] I[,] Cpl. Lyons[,] was sitting at the booking desk when Ofc. J. Evans called via phone from the control room and stated that the inmates in the 10 man cell wanted inmate Chad Price to be moved. I[,] Cpl. Lyons[,] went to the 10 man cell and opened the feeding trap and asked the inmates what the problem was. Inmate Michael Propst stated: "Y'all need to get this man out of here[.] He has been hollering all night and we cannot sleep." I[,] Cpl. Lyons[,] replied: "Where is the inmate at? And why did y'all wait until 5:00 in the morning to tell me about this situation? I have been sitting at the booking desk and walking back and forward all night and I haven't heard anyone yelling or hollering." All inmates stated: "He has been doing it all night." I[,] Cpl. Lyons[,] saw that inmate Chad Price was in the shower because of his clothing handing over the shower curtain. I[,] Cpl. Lyons[,] asked the inmates if that was him in the shower to be sure and they stated yes. I[,] Cpl. Lyons[,] wend back a second time about 5:15 and inmate Price was still in the shower. The last time I went inside the cell along with Ofc. Lamont to check on inmate Price, he was out of the shower laying on his mat beside the 10 man cell's door. Inmate Price was alert and moving on his mat. The inmates in the cell never stated that inmate Price was sick or said that he needed help. Inmate Price looked at me and never said he was sick or anything. The inmates in the cell

---

[5] Pergerson avers: Price "was assigned an upper bunk. Another man was assigned the lower bunk"; Price "was withdrawing badly all night, shouting, restless, and he got very little sleep"; Price "asked for help from Corrections staff, but did not receive any help"; Price "moved his bedding near the door, and on the floor"; Price "suffered several seizures during his withdrawal." Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶¶5–8. Whyche avers: Price "initially did not appear to be in much distress, but he awakened during the night having hot flashes and other distress, in the shower screaming [sic]"; "Some of the other men in the cell were angry with Chad Price because he was disturbing everyone"; Price "was initially assigned the top bunk, but because he was so restless, moving turning, and kicking, some other men moved his things to the floor so the man in the lower bunk could sleep"; "During the night, I, together with some other of the men in the cell, told the warden to do something for Chad Price he is sick, withdrawing. Nobody needs to go through that. He can't do anything for himself"; "At one point during the night, a man named Dale asked the jail staff to do something about Chad Price, because he was upsetting everyone. Nobody from jail staff came or responded in any way to Dale's request"; and "even though the inmates in the 10-man cell specifically asked jail staff to get [Price] help during the night before his condition became deadly, none of the officers took any steps to get him any medical attention." Pl.'s Ex. 9, Wyche Aff. [D.E. 86-10] at ¶¶5–7, 10, 14.

9

wanted him out because they could not sleep because they said he was yelling. None of my officers in the control room heard yelling. While sitting at the booking desk[,] if yelling was going on I would have been able to hear it for myself and I did not hear any yelling. I[,] Cpl. Lyons[,] called to the control room several times after walking in the cell and observing Inmate Price, to ask Ofc. J. Evans was inmate Price seeming to be doing okay[,] and Ofc. J. Evans stated yes each time. Ofc. Lamont was the Ofc. On rounds at the time and he checked in on him during each round.

Defs. App., Ex. 2C [D.E. 74-2] at 35.[6]

Defendants describe the video evidence of the morning of December 8, 2018, as follows: "from 5:13 to 5:40 a.m. . . . the video depicts Price waking up to shower"; while Price showers, another inmate goes to the intercom at 5:18 a.m.; "Price finishes showering" circa 5:47:30 a.m.; Price exits the shower and, out of camera view, puts on his orange jumpsuit; "Price is walking normally"; Price "pushes the intercom/call button" circa 5:49 a.m.; Price "throws a blanket on a folded mat near the front door, and paces while adjusting his jumpsuit"; and, "at no point during this time is Price depicted going in and out of consciousness, walking strangely, or otherwise alerting detention staff or inmates to any emergency."[7] Defs.' Stmt. Mat. Facts [D.E. 73] at ¶39; but see Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶7 ("At approximately 6 a.m., Price himself asked for medical assistance through the intercom, saying, 'I need help. I've had a seizure.'").[8]

From 5:50 a.m. to 6:10 a.m., Price "rolls out a mat, lies down on it, and covers himself with a blanket," and situates directly to the left of the door. "Two detention officers come into the cell

---

[6] Robertson declares: "Multiple attempts were made to locate Officer Lyons, to no avail"; but Lyons' Jail Incident Report was attached to defendants' appendix. Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶13.

[7] Robertson declares, inter alia: as custodian of Detention Center videos, he "confirmed that the videos . . . are true and accurate videos depicting Mr. Chad Price on the morning of December 8, 2018." Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶27.

[8] Pergerson avers that: at approximately 6 a.m. on December 8, "after one seizure, [Price] recovered and hit the call button, and said 'I need help. I've had a seizure'"; "At least two times before that, someone else had hit the call button, saying that [Price] needed help"; "There was no response." Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶8.

10

and stand in the doorway" as Price "is laying down on the mat, adjusting his sleeping position intermittently, [and] covering his face with the blanket." Defs.' Stmt. Mat. Facts [D.E. 73] at ¶40; see Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶35 (declaring Price is "resting or attempting to rest," and "there are no sudden or convulsive movements depicted as to Mr. Price").

From 6:10 a.m. to 6:58:30 a.m.: Price "continues to lay down on his mat"; "other inmates press the call button, [and] otherwise walk around in close proximity to" Price; "detention officers come into the cell and walk around"; inmates sit and watch the television that hangs near the door; an inmate trustee starts cleaning the surfaces of the cell. Defs.' Stmt. Mat. Facts [D.E. 73] at ¶41; see Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶36 (declaring "there are no sudden or convulsive movements depicted as to Mr. Price"; Price "appears to be sleeping or attempting to rest"; and "inmates do not appear to be alarmed or alerted by any [of] Price's actions.").

From 6:58 a.m. to 7:41 a.m., Price "sits up, looks around, and continues to lay down on his mat," and "adjusts his sleeping position a few times." Defs.' Stmt. Mat. Facts [D.E. 73] at ¶42; see Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶37 (declaring "there are no sudden or convulsive movements depicted as to Mr. Price"; and "Price is depicted continuing to rest or attempt to rest, as is common with inmates in the early morning hours such as 5 a.m. to 9 a.m.").

From 7:41 a.m. to 7:50 a.m., "Price sits up and appears to put on socks before laying back down", and "Price leans back on the wall, stands up, circles a few times, and stands in the back of a line of inmates which are watching TV and waiting for breakfast to be passed out." Defs.' Stmt. Mat. Facts [D.E. 73] at ¶43; see Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶38 (declaring this video timeframe shows: "at no time is Price acting unusually or making sudden movements or convulsing"; and Price "is acting normally and interacting with other inmates").

11

From 7:50 a.m. to 8:00 a.m.: Price takes his breakfast tray and puts it on a table; Price lies back down on his mat; Carter hands Price unidentified medication, which Price takes and then immediately vomits; Price points to his sleeping mat and an inmate trustee rolls up the mat and sweeps the floor to clean up.[9] <u>Compare</u> Defs.' Stmt. Mat. Facts [D.E. 73] at ¶44, <u>with</u> Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶8 ("Carter apparently took it on himself to administer some unauthorized and unidentified medication to Price, which caused Price to vomit immediately").

From 8:00 a.m. to 8:20 a.m., the trustee continues to clean up, a folded-up blanket is brought to Price, an inmate unrolls a large amount of toilet paper to continue to clean up the vomit, and Price lies back down on the floor. <u>Compare</u> Defs.' Stmt. Mat. Facts [D.E. 73] at ¶46, <u>with</u> Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶8 (stating, "the extent of the jailers' response to [Price vomiting] was simply to clean the mess, bring Price more linens, and otherwise go about their business"); <u>see</u> Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶40 (declaring the video in this timeframe shows "there are no sudden or convulsive movements depicted as to Mr. Price.").

---

[9] Robertson declares that the video in this timeframe reflects: "A detention staff member interacts and hands a cup to another inmate"; "A detention officer hovers over Price's mat, checks on Price, hands Price what appear to be pills, and Price takes them"; "Price appears to immediately vomit after taking the pills, points to his mat, and the mat is removed"; "An inmate trustee rolls up the mat and sweeps up the floor, apparently cleaning up the vomit." Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶39. Carter declares: "Although I do not have a recollection of it, the video shows that earlier that morning of December 8, 2018[,] I gave medication to Inmate Price during the 'med pass'"; "If Mr. Price did not have order for any meds, [the medication given] would have been antacid or over-the-counter pain reliever"; "as soon as I gave the med cup to Price and he took it, he threw up immediately"; Carter followed Detention Center "protocol in assisting Price when he vomited and was not feeling well during the med pass"; "Price's isolated incident of vomiting did not indicate to [Carter] that Mr. Price was undergoing any severe symptoms and did not indicate to [Carter] that [Price] was undergoing some type of severe withdrawal or overdose"; "After the isolated incident of vomiting, Mr. Price did not vomit thereafter or otherwise indicate that anything serious was going on medically"; and "Price was otherwise walking around, interacting with [Carter] and other inmates, and acting normally . . . prior to 8:54 a.m." <u>Id.</u>, Ex. 8, Carter Decl. [D.E. 74-8] at ¶¶8–12. Limerick declares: "the isolated incident of vomiting did not indicate to me or other [Detention Center] officers that Mr. Price was undergoing any severe symptoms"; and "To my knowledge, I did not hear of and there was no indication of any blood in the vomit [sic]." <u>Id.</u>, Ex. 1, Limerick Decl. [D.E. 74-1] at ¶26. Pergerson avers: Price "was given some kind of medicine in a pill by Corrections staff, and something to drink. He immediately puked on the floor." Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶10. Whyche avers: "Chad Price gave his tray of food to me when breakfast was distributed, and ate none of it." Pl.'s Ex. 9, Wyche Aff. [D.E. 86-10] at ¶8.

12

From 8:20 a.m. to 8:29 a.m., Price speaks into the intercom, walks to the toilet behind a curtain, puts his jumpsuit back on, walks back to his spot on the floor (to the left of the door), and sits down and leans back against the wall. Defs.' Stmt. Mat. Facts [D.E. 73] at ¶47; see Defs.' App., Ex. 2 Robertson Decl. [D.E. 74-2] at ¶41 (declaring, in this timeframe: "Price continues to walk normally, is at no time convulsing, flailing, or depicted going in and out of consciousness.").

From 8:29 a.m. to 8:50 a.m., "Price speaks into the intercom again, walks back to his spot, lies down, and uses the folded up blanket as a pillow. Price continues to lay down and rolls over to his left side at 8:45:30 a.m., facing away from the camera." Defs.' Stmt. Mat. Facts [D.E. 73] at ¶48; Defs.' App., Ex. 2 Robertson Decl. [D.E. 74-2] at ¶42 (declaring, in this timeframe: "There are no sudden or convulsive movements depicted as to Mr. Price").

"From 8:50 a.m. to 8:54:07 a.m., Price continues to lie in his spot on the mat to the left of the door. He appears to be laying still" Defs.' Stmt. Mat. Facts [D.E. 73] at ¶49; Defs.' App., Ex. 2 Robertson Decl. [D.E. 74-2] at ¶43.

At approximately 8:54:08 a.m., Price has a severe seizure, rocking from side to side, rolling off the mat at 8:54:17 a.m., and convulsing, with arms flailing. At 8:54:26 a.m., inmates see Price and press the emergency call button. Compare Defs.' Stmt. Mat. Facts [D.E. 73] at ¶¶50, 52, with Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶8 ("around 9:00 a.m.," "Price suffered a seizure that was severe enough to bring the other men in the cell to their feet to call the jailers.").[10]

---

[10] Whyche avers: "After breakfast, Chad Price started suffering a seizure. Some men punched the call button to get the attention of the jail staff." Pl.'s Ex. 9, Wyche Aff. [D.E. 86-10] at ¶13. Pergerson avers: Price "laid back down, and had a serious seizure. Other inmates called for help but still no help was forthcoming." Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶11. Robertson declares, inter alia: when Price rolls off his mat, "an inmate pops his head out quickly, as if he notices something unusual"; "This is the first time in the videos when Price is depicted convulsing or acting in this matter [sic]"; and "Several inmates jump out of bed and go to the intercom/call button." Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶44. Limerick declares: when Price "began what appeared to be a severe seizure, his cellmates immediately notified [Detention Center] staff via the emergency call button, and [Detention Center] officers arrived at the cellblock promptly." Id., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶40.

13

At approximately 8:54 a.m., Hicks calls over the radio reporting that Price was having a seizure, but the parties dispute the details of the officers' response.[11]  Compare Defs.' Stmt. Mat. Facts [D.E. 73] at ¶¶51, 53 (stating: Limerick, Hicks, and Carter responded to the 10-man cell; Limerick and Hicks arrive at the cell at 8:55:04 a.m. and "are depicted at 8:55:27 a.m. bending over close to Price, as if to see whether he is responding"; Carter and an inmate trustee arrive with a wheelchair at 8:55:36 a.m.; and, at 8:57 a.m., Price is placed in the wheelchair and wheeled out of the cell), with Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶9 ("Limerick, Carter and Lyons responded, and entered the cell.   The officers laughed at Price and commented that 'he just needs another fix.   He'll be fine.' . . . Nonetheless, the officers called a trusty [sic] to retrieve a wheelchair to carry the lifeless Price to the vacant nurse's station.").[12]

---

[11] Robertson declares that the video in this timeframe reflects: "At 8:55:04 a.m., less than one (1) minute later, detention officers come into the cell to check on Price"; "Both detention officers are depicted at 8:55:27 a.m. bending over close to Price, as if to see whether he is responding"; "An inmate trustee and a third detention officer arrive at 8:55:36 a.m."; "At 8:57 a.m., three (3) minutes after Price begins to convulse and detention officers are alerted, Price is placed on a wheelchair and wheeled out of the cell."  Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶45. Limerick declares: Hicks called over the radio reporting Price was having a seizure; Limerick, Hicks, and Carter responded to the cell; "Not even one minute had passed by from the time Mr. Price began experiencing a seizure, the time inmates pressed the call button, and the time [Detention Center] officers arrived to Mr. Price's aid [sic]"; when Limerick arrived at the cell, "Price was lying on his side with saliva coming from the side of his mouth"; and Limerick "instructed Sgt. Carter to get the wheelchair so that [they] could get Price to the nurses' station to be checked."  Id., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶41.  Carter declares: Carter "was working in the back hallway . . . with a Trustee when [ ] Hicks called over the radio at approximately 8:54 a.m. and stated that an inmate was having a seizure"; "I called the Trustee out of the . . . shower area and we proceeded to the 10-man cell to assist"; "upon arrival at the 10-man cell[,] I saw [ ] Limerick and [ ] Hicks"; Limerick told Carter "to run and get a wheelchair, which [Carter] did"; and "After returning with the wheelchair, [ ] Price was placed in the chair and taken to the nurse's station."  Id., Ex. 8, Carter Decl. [D.E. 74-8] at ¶¶4–6.  Whyche avers: "After a delay, jail staff came in.  Chad Price was dying.  It was apparent that the life was leaving him.  The female Corrections Officer laughed at him while he was dying.  The corrections officer got a Trusty [sic] to pick Chad Price up and put him in a wheelchair, but the life was departing him while they were doing that."  Pl.'s Ex. 9, Wyche Aff. [D.E. 86-10] at ¶13.  Pergerson avers: "At one point a Corrections Officer, an older woman, came to the window in the door to observe.  She said[,] 'He just needs another fix.  There's nothing wrong with him.'  Then she left."; "Chad may have seized five times before he died"; The last time he seized, Corrections staff responded, but waited for a Trusty [sic] to get a wheelchair before picking him up off the floor"; Price "was dead or dying.  The inmates in the cell, including me, concluded that he had died in the cell."  Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶¶12–15.

[12] Plaintiff statement that Lyons was one of the three officers who responded to the cell is contradicted by the complaint, see Compl. [D.E. 1] at ¶45, and the declarations of Limerick and Carter, both of whom identify Hicks as the third officer, Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶41; id., Ex. 8, Carter Decl. [D.E. 74-8] at ¶¶4–5.

14

At the nurse's station, Limerick checked Price's vitals and reported a blood pressure of 103/77, and contacted part-time nurse, Diane Varnadore via telephone. Nurse Varnadore advised Limerick to contact EMS to transport Price to the hospital, but the parties somewhat dispute the details.[13] Compare Defs.' Stmt. Mat. Facts [D.E. 73] at ¶54, with Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶9 (stating: once at "the nurse's station, Limerick made the first call to a medical professional"; and "Limerick described some of the symptoms that she had witnessed, but importantly omitted to advise [Nurse] Varnadore that Price had suffered a seizure").

At approximately 9:01 a.m., Limerick called EMS and advised that she had an inmate who was believed to be suffering a seizure or possibly withdrawal. The dispatcher asked whether Price was conscious and whether he was breathing, and Limerick confirmed that Mr. Price was both conscious and breathing at that time. Defs.' Stmt. Mat. Facts [D.E. 73] at ¶55; see Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶43.

Neither the dispatcher, nor the nurse, nor anyone else advised Limerick to perform CPR or to administer any treatment or medication.[14] Defs.' Stmt. Mat. Facts [D.E. 73] at ¶¶57–58.

---

[13] Limerick declares, inter alia: "I called [the nurse] and reported that Price was in the nurses' station with nausea and vomiting and appeared to be semi-conscious"; and the nurse advised Limerick to call 911 and have Price transported by EMS to the hospital. Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶42. Carter declares: "I stayed at the nurse's station with [ ] Limerick as she checked his vitals and placed a call to our part-time nurse, then called EMS as instructed by the nurse." Id., Ex. 8, Carter Decl. [D.E. 74-8] at ¶6.

[14] Limerick declares, inter alia: "because Limerick "perceived that Mr. Price was conscious and breathing and knew that EMS was arriving promptly, [Limerick] did not believe it was necessary to perform CPR," but Limerick "would have done so without hesitation" if Limerick "had been instructed to do so by the nurse or dispatcher"; Limerick "did not personally believe that Naloxone or Narcan was necessary" because Limerick "personally believed that Mr. Price was suffering from a severe withdrawal rather than an overdose"; Limerick "had no reason to believe that Mr. Price could have ingested substances while at the [Detention Center] or otherwise would have been suffering from an overdose"; "since Naloxone or Narcan are used for overdoses and not withdrawals, [Limerick] did not believe Naloxone/Narcan was necessary"; and "had EMS or the nurse advised [Limerick] to administer Naloxone/Narcan, [Limerick] would have done so without question"; "At the time when I arrived to the cell at 8:55 a.m., I had no reason to believe that Mr. Price could have ingested any opioids while at the [Detention Center] and my personal belief was that he may have been suffering from a withdrawal"; and "the ultimate decision or opinion on what Mr. Price was undergoing and what treatment was necessary is within the purview of medical professionals." Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶¶45–47.

15

"While waiting for EMS[,] Limerick also contacted 1st Sergeant Cash and Jail Administrator J.J. Hayes and advised them of the situation. [Limerick] continued to talk to Price saying[,] 'Stay with me, Chad,' rubbing his chest. His head was dropping[,] and he appeared to be going in and out of consciousness." Defs.' Stmt. Mat. Facts [D.E. 73] at ¶56; see Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶44.

At approximately 9:05 a.m., EMS arrived, "began rendering medical care to Mr. Price immediately upon arrival." Carter had "pushed Price in the wheelchair to Door 27 to meet EMS." "EMS found Price not to be breathing and without a pulse, began performing 2-person CPR, and started mechanical CPR." "EMS eventually put Mr. Price on a stretcher and transported Mr. Price out of the Detention Center around 9:21 a.m." Defs.' Stmt. Mat. Facts [D.E. 73] at ¶¶61–62; see Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶48; id., Ex. 8, Carter Decl. [D.E. 74-8] at ¶7; but see Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶10 (stating: "EMS arrived five minutes later, and noted that Price was asystole, without pulse or conscious [sic] and ashen gray"; and "Limerick reported to the EMS workers that Price was 'in and out all night'").[15]

"Price was transported and arrived at the Granville Medical Center at 9:24 a.m., where he was pronounced dead. An autopsy was later conducted[,] and it was determined that Price's cause of death was determined to be 'acute fentanyl toxicity,' or an overdose of fentanyl." Defs.' Stmt. Mat. Facts [D.E. 73] at ¶¶62–63; accord Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶10; see also Defs.' App., Ex. 12 [D.E. 74-12] (Report of Autopsy Examination and Toxicology Report noting

---

[15] The EMS records reflects, *inter alia*: EMS was dispatched "in reference to a 'possible withdrawal, foaming at the mouth"; "EMS greeted outside of facility by guards"; "2 other guards brought patient out in a wheelchair"; "Patient was unconscious male, flaccid. Patient was ashen grey"; "Guards stated that 'he was in and out all day long' also stated he wis a known heroin user, usually 10 bags a day"; "Patient transferred from wheelchair to stretcher and secured"; "Patient found to not be breathing, no pulses." Pl.'s Ex. 3 [D.E. 86-4] at 5.

16

the presence of Fentanyl in Iliac vein blood of 18 ng/mL); id., Ex. 13 [D.E. 74-12] at 9, 11 (Expert opinion Hime, opining, *inter alia*, that: "Fentanyl concentrations above 4 ng/mL can have tox effects, higher can be lethal"; "Fentanyl in fatal cases range from 3.0-28 ng/mL in blood"; "It is highly unlikely considering the half-life of fentanyl that [Price] had consumed it before he was arrested some 17 hours prior to his death"; "It is more likely . . . that [Price's] exposure was more recent to his time of death"; "Price's demeanor from the time of his arrest up to shortly before his death does not appear to indicate someone under the influence of fentanyl" because Price "does not appear sedated, drowsy, dizzy, euphoric, or suffering from respiratory depression"; "Considering the fentanyl blood concentration at death, the concentration would have had to be significantly higher and even more likely a fatal concentration if present any time in the hours before his death"; "Some of these symptoms do not begin to appear until his last hour"; "This leads [Hime] to believe the route of administration was by insufflation or orally and was absorbed into the blood over a period of time" which "could have taken 30-90 minutes post dose depending on the contents of his stomach"; thus, Hime concludes, Price "was exposed to the drug in the last couple of hours before his death"); but see Pl.'s Ex. 5 (Expert opinion of Dr. McCoy, opining, *inter alia*: "Both heroin, which comes from a plant, and Fentanyl, which is made in a laboratory, suppress breathing, which is often the mechanism of death, but Fentanyl is about 50 times stronger than heroin"; "Apparently other inmates saw [Price] with difficulty breathing and alerted jail staff" but "there is no documentation . . . how long that it took jail staff to respond"; Price "was reported to be going in and out of consciousness all day"; "there is no excuse for an inmate going in and out of consciousness all day long, without medical intervention" because "it poses serious risks to his health"; "Price was placed in a group cell with other inmates as he struggled against respiratory

17

suppression, a symptom of Fentanyl overdose"; Price "was reported to be gasping for air all day"; "He vomited and had some type of seizure activity, lapsing in and out of consciousness"; "Jail staff, apparently untrained in this area, may have misinterpreted [Price's] symptoms for drug withdrawal"; "It should have been determined how much opiate he took on admission to the jail"; "more likely than not[, Price] lost his life due to inactivity by jail staff while sitting in the group cell, where his condition apparently was ignored"; and "It is more likely than not that [Price] would have survived had he received appropriate medical attention prior to his ashen gray skin color and flaccid muscle tone described by EMTs when they arrived.").

Sheriff Wilkins later met with Price's family to inform them of the death and told them that: Wilkins "knew Price was strung out on drugs when he was admitted, and needed a fix"; "Price was well known to the Sheriff's Department and was known to be a heroin addict"; and "Price might have obtained fentanyl in the jail because he, Wilkins, was unable to keep it out." Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶10; see Pl.'s Ex. 7, Mark Price Aff. [D.E. 86-7] at ¶6.

Prior to Price's death in December 2018, "incidents of inmate opioid overdoses, incidents of inmate severe withdrawals, and other opioid issues, were not commonplace in the GCDC." "From at least 2012 to the date of Mr. Price's incident, GCDC did not have any incidents of opioid-related deaths whatsoever."[16] Defs.' Stmt. Mat. Facts [D.E. 73] at ¶21.

---

[16] Limerick declares, *inter alia*: Limerick has been employed with GCDC for over 20 years; and "Prior to Mr. Price's incident in December of 2018, [Limerick does] not recall ever having to respond to a severe drug overdose or severe withdrawal incident. During that time, incidents of inmate opioid overdoses, incidents of inmate severe withdrawals, and other opioid issues, were not commonplace in the GCDC and [Limerick] did not witness such events." Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶¶2, 5. Robertson declares: "from at least 2012 to the date of the Mr. Price incident, GCDC did not have any incidents of opioid-related deaths whatsoever. There was no pattern or widespread practice of allowing for such incidents to occur at any time leading up to Mr. Price's unanticipated and sudden overdose." Id., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶26. Granville County Commissioner Russell E. May, Sr., declares: "Leading up to the December 2018 incident, from at least 2012, Granville County was not informed of any deaths by overdose or severe withdrawal occurring at the GCDC. Id., Ex. 4, May Decl. [D.E. 74-4] at ¶5.

18

<u>Plaintiff's Remaining Claims for Relief</u>:

Plaintiff's first claim for relief generally argues that, pursuant to 42 U.S.C. § 1983 and <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691–92 (1978) ("<u>Monell</u>"), Granville County and the "Granville County Sheriff": (1) had inadequate policies, procedures, and customs in place for providing adequate medical care for severely intoxicated inmates; (2) inadequately trained employees to address "the medical issues and perils of opioid withdrawal"; and (3) "made grossly inadequate provisions for medical attention" for GCDC inmates. Compl. [D.E. 1] at ¶¶52–76.

Plaintiff's second claim for relief argues that, pursuant to § 1983, Granville County, Wilkins, Noblin, and the officer defendants were deliberately indifferent to Price's serious medical needs when they failed to provide him access to constitutionally adequate medical care, that such medical care deprivations at the Detention Center were widespread and commonplace, "defendant correctional officers and jail personnel" are liable under a theory of bystander liability, and the environment created by defendants at the Detention Center "is the proximate cause of the injuries, suffering, death, and damages suffered by Price." <u>Id.</u> at ¶¶77–87.

In his third claim for relief, plaintiff argues all officers present while Price was at the Detention Center "failed to take any meaningful action to provide or secure medical attention for Price, despite their knowledge and awareness of his medical peril and suffering[,]" constituting deliberate indifference and a cognizable bystander liability claim under § 1983. <u>Id.</u> at ¶¶89–90.

In his fifth claim for relief, plaintiff argues, pursuant to N.C. Gen. Stat. §162-55, "Wilkins, and the correction officers and supervisors are guilty of criminal negligence" that was "a proximate cause of the suffering, injuries and death of Price." <u>Id.</u> at ¶¶97–99.

Plaintiff's sixth claim for relief asserts that, pursuant to N.C. Gen. Stat. §28A-18-2, Price's heir is entitled to damages because Price's wrongful death "was caused by the intentional, wrongful wanton, willful and grossly negligent acts or defaults of defendants." Id. at ¶¶100–110.

Plaintiff's eighth claim for relief asserts that Western Surety "is a surety upon bonds posted by Sheriff Wilkins and Noblin, and is liable to plaintiff for the obligations of their indemnitees according to law." Id. at ¶117.

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

1) Plaintiff's §1983 claims against defendants in their individual capacities:

20

Plaintiff second and third claims for relief generally allege defendants' failure to provide Price adequate medical care at the Detention Center amounts to either "deliberate indifference," in violation of the Fourteenth Amendment, or an actionable claim on a bystander liability theory.

Courts evaluate pretrial detainee conditions of confinement under the Fourteenth Amendment's Due Process Clause. See Kingsley v. Hendrickson, 576 U.S. 389, 400–01 (2015) ("Kingsley"); Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021). Prior cases in the United States Court of Appeals for the Fourth Circuit, however, "elided the distinction between Eighth Amendment claims of post-conviction detainees and the Fourteenth Amendment claims of pretrial detainees." Short, 87 F.4th at 608; see Brown v. Harris, 240 F.3d 383, 388–89 (4th Cir. 2001) (finding it unnecessary to determine whether a § 1983 plaintiff was a state prisoner or pretrial detainee because, in either event, the court would apply the Eighth Amendment deliberate indifference framework of Farmer v. Brennan, 511 U.S. 825 (1994)). Thus, a pretrial detainee could "make out a violation at least where 'he shows deliberate indifference to serious medical needs under cases interpreting the Eighth Amendment.'" Martin v. Gentile, 849 F.2d 863, 871 (4th Cir. 1988) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

An Eighth Amendment claim for deliberate indifference to serious medical needs requires an objective showing that the medical condition was "serious" and a subjective showing that the prison official acted with a "sufficiently culpable state of mind." Mays, 992 F.3d at 300. "A medical condition is objectively serious when it either is 'diagnosed by a physician as mandating treatment' or is 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016)). "The subjective state of mind required is that of deliberate indifference . . . to inmate health or safety."

21

Id. (citation and internal quotation marks omitted). "And deliberate indifference requires that the official have 'had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction.'" Id. (quoting Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014)). The Mays court declined to resolve whether the Supreme Court's decision in Kingsley, 576 U.S. at 392 (finding a pretrial detainee's excessive force claim required only a showing that the officers' use of force was objectively unreasonable), "altered this deliberate-indifference standard when applied to pretrial detainees." Mays, 992 F.3d at 300–01.

In Short, the Fourth Circuit newly announced that, to make out a claim based on alleged deliberate indifference to a serious medical need, a pretrial detainee must show:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had the condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

Short, 87 F.4th at 611.

Under the standard announced in Short, "the plaintiff [need not] show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." Id. Instead, the plaintiff must show that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm is either known or so obvious that it should be known." Id. Nevertheless, even under this new standard, negligence, or the accidental failure "to do right by the detainee," is insufficient. Id. at 611–12.

Defendants argue, *inter alia*: that individual defendants are at least entitled to qualified immunity because the new standard announced by Short was not clearly established at the time of

22

the incident in question; and that, even applying Short, the individual defendants objectively did not violate Price's constitutional rights. See Defs.' Sup. Br. [D.E. 98].

Plaintiff generally argues the court should apply Short and that defendants are not entitled to summary judgment. Pl.'s Sup. Br. [D.E. 99] at 2. As to the first Short factor, plaintiff argues that Granville County Sheriff's Department employees knew Price was suffering from opioid dependence, Price alerted Limerick at intake that he was taking ten bindles of heroin daily, Limerick previously placed Price on withdrawal protocol at the Detention Center, and Sheriff Wilkins "admitted to Price's brother that he knew that when Price was admitted to the detention center he was high on heroin and that he, Wilkins, could not stop Price from obtaining drugs in his jail." Id. at 9–10. Plaintiff further argues that heroin addiction "is a serious medical condition that requires medical treatment," and that the expert witnesses both agree that "Price inevitably would undergo withdrawal during his confinement," and "Price required medical supervision of withdrawal and detoxification, which was not available" at the Detention Center. Id. at 10.

As to the second Short factor, plaintiff argues that, although there was a "nurse on call at all times" and a "doctor had a contract for availability" with the Detention Center, "not a single officer ever once made the slightest effort to have Price evaluated medically, at least until Price was already lifeless." Id.

As to the third Short factor, plaintiff argues that defendants "knew of Price's condition through multiple avenues and that their inaction posed an unjustifiably high risk of harm." Id. Plaintiff reiterates that Limerick knew the level of Price's drug habit at initial screening and had previous experience with Price "withdrawing on her watch," and that Sheriff Wilkins "knew of Price's medical condition" and "knew of the unreasonably high risk that Price might obtain illegal

drugs while confined" at the Detention Center.  Id. at 10–11.  Plaintiff notes that fellow Detention Center inmates Whyche and Pergerson have averred that "other dormmates repeatedly contacted officers during the night to advise that Price was severely suffering form withdrawal, could not rest, was having seizures, and needed medical attention."  Id. at 11.  Plaintiff also notes Pergerson's specific averment that "Price himself sought medical assistance from the officers on duty, without response."  Id.  Plaintiff argues that defendant Carter "recognized that Price needed medical attention," did not "advocat[e] that Price see a medical professional," but instead "took it upon himself to administer some unknown preparation which caused Price to vomit immediately."  Id.  Plaintiff also argues that, because she "places herself" at the front desk, defendant Lyons "would have been the person who received communications from Price and his dormmates."  Id.  Plaintiff further argues that, when Price "began to experience the final agonies of seizures and death, Limerick and Carter were present and merely laughed at him, saying that all he needed was another fix," and that Limerick "did not contact the nurse until after the medical attention was useless because Price had suffered an agonizing death."  Id.  Plaintiff contends that these incidents show that defendants Wilkins, Limerick, Carter, and Lyons recognized that Price required medical attention, "drew the inference that something must be done, yet purposefully and intentionally refused to take any reasonable measures to get [Price] the medical attention he required" such that, as to these defendants, "plaintiff has met the more stringent subjective standard that prevailed in the Fourth Circuit before Kingsley."  Id. at 11–12.

As to the fourth Short factor, plaintiff argues that "these events claimed Price's life," failure to provide needed medical attention is necessarily unrelated to any legitimate penological

24

objective," and this standard is satisfied "because Price never received any medical attention at any point prior to his death." Id. at 12.

The court has reviewed: the body cam video of Price's arrest on December 7, 2018, the soundless Detention Center video of the 10-man cell between 5:13 a.m. and 9:00 a.m. on December 8, 2018, and the audio of the 911 call made by Limerick. See Defs.' App., Ex. 6, Ex. 7, Ex. 11, [D.E. 74]. The court finds that defendants' statement of facts and Robertson's declaration accurately describes these media. See, generally, Defs.' Stmt. Mat. Facts [D.E. 73]; Defs.' App., Ex. 2, Robertson Decl. [D.E. 74-2].

The court now turns to plaintiff's individual claims against Sheriff Wilkins. The court presumes, without deciding, that Wilkins acknowledged personal awareness that Price was intoxicated by opioids upon his arrival at the Detention Center and that the Sheriff's Department was incapable of keeping all drugs out of the Detention Center. See Pl.'s Reply Stmt. Mat. Facts [D.E. 87] at ¶10; see Pl.'s Ex. 7, Mark Price Aff. [D.E. 86-7] at ¶6. Plaintiff, however, does not demonstrate, and the record does not support any inference, that Wilkins was personally involved in the purported denial of needed medical care for Price. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (noting a § 1983 plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (requiring a §1983 plaintiff to "affirmatively show[ ] that the official charged acted personally in the deprivation of the plaintiff's rights," but finding that mere knowledge of such a deprivation does not suffice (internal quotation marks omitted)). Further, particularly because the record establishes that plaintiff died of fentanyl overdose, not heroin withdrawal, even under the standard announced in Short, the record does not support an inference

25

that that Wilkins' "action or inaction posed an unjustifiably high risk of harm," and that, as a result, Price was harmed.   Cf. Short, 87 F.4th at 611.

Plaintiff also makes additional claims as to Wilkins – that "the trier of fact may find that Wilkins' criminal operation as the Sheriff of Granville County coopted the Sheriff's Drug Task Force to such an extent that drugs were available to inmate in the jail, and that Wilkins was aware of this criminal activity," and that "the trier of fact may also fairly conclude that Wilkins was deliberately indifferent to the source of deadly fentanyl in his jail," because Wilkins "did not open and inquiry how Price got fentanyl that killed him[,] suggest[ing] that Wilkins was protecting his own, and tolerated the introduction of deadly substances inside his jail."   Pl.'s Mem. [D.E. 85] at 11–12.   These new, speculative claims likewise are unsupported by any record evidence and plaintiff may not amend his complaint through argument in opposition to defendants' motion for summary judgment.   See Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished).

To the extent plaintiff instead premises claims against Wilkins on a theory of supervisory liability, plaintiff does not contest defendants' statement that from at least 2012 to the date of Mr. Price's incident, GCDC did not have any incidents of opioid-related deaths whatsoever, see Defs.' Stmt. Mat. Facts [D.E. 73] at ¶21, or the supporting declaration that, during that timeframe, incidents of inmate opioid overdoses or severe withdrawals were not commonplace in the GCDC, see Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶5.   Thus, even if the court presumes Wilkins' knowledge of risk to Price due to his substance abuse disorder, plaintiff still fails to demonstrate that the subordinate officer conduct at issue was "pervasive," meaning "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged

26

in by the subordinate poses an unreasonable risk of harm of constitutional injury," or that there was an "affirmative causal link" between Wilkins' "inaction and the particular constitutional injury suffered by the plaintiff."   Cf. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

As to Lyons, plaintiff argues that: "Lyons admits that she was stationed at the control desk"; a jury "may fairly conclude that she is therefore the officer who, at the control desk, received many calls for assistance by Price and the other inmates in the 10-man cell who pleaded for medical assistance"; and that Lyons' "decision simply to ignore these pleas for help constitutes deliberate indifference."   Pl.'s Mem. [D.E. 85] at 10; see also Compl. [D.E. 1] at ¶¶42–43.   Plaintiff also argues that, because she "places herself" at the front desk, Lyons "would have been the person who received communications from Price and his dormmates," and that Lyons recognized that Price required medical attention, "drew the inference that something must be done, yet purposefully and intentionally refused to take any reasonable measures to get [Price] the medical attention he required."   Pl.'s Sup. Br. [D.E. 99] at 11–12.

The video reflects, at 5:13:54 a.m., Price leaves the bunk area and walks toward the shower, returns briefly to the bunk area, and then walks back to the shower, begins to undress, and enters the shower.   See Defs.' App., Ex. 7 (ch15_20181208051300.avi).   At 5:18:50 a.m., as Price remains in the shower, an inmate goes to the call button.   Id.   At 5:20:50 a.m., an officer arrives outside the cell door and appears to be speaking to the inmate who pressed the call button as the inmate gestures in the general direction of the shower.   Id. (ch15_20181208052000.avi).   At 5:21:54 a.m., what appears to be a different officer arrives outside the cell door and appears hold a 30-second conversation with a different inmate who also gestures toward the shower.   Id.   At 5:30:22 a.m., an officer arrives outside the cell door and appears to look inside the cell in the

27

direction of the shower. Id. (ch15_20181208053000.avi). At 5:45:58 a.m., an inmate carries what appears to be a sleeping mat (presumably Price's) toward the cell door, places it on the ground, and returns to the bunk area. Id. (ch15_20181208054000.avi). When Price emerges from the shower circa 5:47:30 a.m., he gets dressed, walks towards the bunks, and then towards sleeping mat near the door where he presses the call button, paces, adjusts his jumpsuit, and moves the mat. Id. At 5:50 a.m., Price settles onto the sleeping mat to the left of the cell door and covers himself with a blanket. Id. (ch15_20181208055000.avi). At 5:51:17 a.m., an officer arrives outside the cell door. Id. At 5:51:51 a.m., the cell door opens and two officers, step just inside the cell and appear to look around. Id. The shorter, female officer appears to speak to the inmates as Price remains laying on the mat under a blanket. Id. Price also pressed the call button both at 8:20:30 a.m. and 8:29:50 a.m., and an officer responded to the cell at 8:36:30, provided a new sleeping mat, and appears to have conversed with Price. See Id. (ch15_20181208082000.avi to ch15_20181208083000.avi).

Although plaintiff implies that Lyons' Jail Incident Report is unreliable, see Pl.'s Mem. [D.E. 85] at 10, the report broadly aligns with the above-discussed video evidence. See Defs. App., Ex. 2C [D.E. 74-2] at 35. Crediting the averments of Pergerson and Whyche that Price, due to withdrawal, was restless and disturbing other inmates, the video evidence nevertheless reflects that, during this timeframe, Price appears to be walking normally, does not appear to be in medical distress and, when in the presence of officers, does not seem to request medical assistance. There also is no record evidence that Price submitted a sick call request on December 7 or 8, 2018, see Defs.' App., Ex. 2, Robertson Decl., [D.E. 74-2] at ¶9, whereas the record shows that Price submitted sick call requests during his previous detention at the Detention Center, see Pl.'s Ex. 10

28

[D.E. 86-11] at 5 (May 23, 2018, sick call form indicating treatment received on May 24, 2018), id. at 6 (June 4, 2018, sick call request and treatment).

Despite the averments of Pergerson and Whyche – that officers did not respond to the call-button requests of Price or other inmates – the above-discussed video evidence instead shows that, when the call button was pushed, officers promptly responded to the cell and spoke to inmates or visually assessed the situation and checked on Price. See Defs.' App., Ex. 7 (ch15_20181208051300.avi to ch15_20181208055000.avi, and ch15_20181208082000.avi to ch15_20181208082000.avi). Thus, as to the contention that Detention Center officers were non-responsive when the call button was pressed, plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." Scott, 550 U.S. at 379–80; see also Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011).

Succinctly stated, the record does not support an inference that Lyons acted with a "sufficiently culpable state of mind." Mays, 992 F.3d at 300. Even under the standard announced in Short, the record does not support an inference that Lyons "knew or should have known" that Price "had a medical condition . . . that posed a substantial risk of serious harm," that Lyons' "action or inaction posed an unjustifiably high risk of harm," and that, as a result, Price was harmed. Cf. Short, 87 F.4th at 611.

Turning to Carter, plaintiff argues Carter "drew the inference that Price was in need of medical assistance" because Carter gave Price some medication, in contravention of GCDC policy. Pl.'s Mem. [D.E. 85] at 9. Plaintiff contends that Carter "appoint[ed] himself healthcare authority" rather than "insist that the constitutional deprivation of medical care be remedied." Id. at 9–10. Plaintiff elsewhere argues that Carter "recognized that Price needed medical attention,"

29

did not "advocat[e] that Price see a medical professional," but instead "took it upon himself to administer some unknown preparation which caused Price to vomit immediately." Pl.'s Sup. Br. [D.E. 99] at 11. Plaintiff further argues that, when Price "began to experience the final agonies of seizures and death, Limerick and Carter were present and merely laughed at him, saying that all he needed was another fix." Id.; see also Compl. [D.E. 1] at ¶¶46–48.

As to the provision of medication to Price, Carter declares that, although he does not recall the specific type of medication given, any medication given would have been an antacid or over-the-counter pain reliever. See Defs.' App., Ex. 8, Carter Decl. [D.E. 74-8] at ¶¶8–9. Contra plaintiff's argument that Carter's provision of medication itself violated Detention Center policy, the provision of non-prescription medications, including non-aspirin pain medication, laxatives, antacids, and cold medication, upon an inmate's verbal request is specifically permissible under the policy. See id., Ex. 1B [D.E. 74-1] at 91–92 (GCDC Policy & Procedures Manual, § 4.09).

As to Price's vomiting, Carter declares: he followed Detention Center "protocol in assisting Price when he vomited and was not feeling well during the med pass"; "Price's isolated incident of vomiting did not indicate to [Carter] that Mr. Price was undergoing any severe symptoms and did not indicate to [Carter] that [Price] was undergoing some type of severe withdrawal or overdose"; "After the isolated incident of vomiting, Mr. Price did not vomit thereafter or otherwise indicate that anything serious was going on medically"; and "Price was otherwise walking around, interacting with [Carter] and other inmates, and acting normally . . . prior to 8:54 a.m." Id., Defs.' App., Ex. 8, Carter Decl. [D.E. 74-8] at ¶¶9–12. Similarly, Limerick declares: "the isolated incident of vomiting did not indicate to me or other [Detention Center] officers that Mr. Price was

undergoing any severe symptoms"; and "To my knowledge, I did not hear of and there was no indication of any blood in the vomit [sic]." Id., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶26.

The video evidence reflects that Carter gives Price medication at 7:52:48 a.m. and Price vomits at 7:53:20 a.m. See Defs.' App., Ex. 7 (ch15_20181208075000.avi). From 7:53:30 a.m. to 7:54:40 a.m., Price moves around in a standing position and appears to drink liquid from a cup while interacting with Carter who begins the cleanup process. Id. After Carter leaves the cell circa 7:54:42, Price continues to stand and move around until he sits against a wall, and covers himself with a blanket at 7:54:18. Id. At 7:57:32, Price lays down on the floor and covers himself with a blanket. Id. At 7:58:45, Carter returns with an inmate trustee who begins to clean while Carter looks on in the direction of Price. Id. The trustee removes the soiled mat and Carter remains in the cell until 8:01:24. Id. (ch15_20181208080000.avi). At 8:03:11, an inmate stops by where Price is laying and appears to interact. Id. At 8:04:03, the trustee reenters the cell and continues to clean. Id. At 8:04:09, another inmate walks by and appear to interact with Price. Id. At 8:07:06 a.m., Price sits up briefly and lays back down and adjusts his position. Id. From 8:10 to 8:20 a.m., Price adjusts his position, sits up, and lays down again. Id. (ch15_20181208081000.avi). At 8:20:30, Price stands up, goes to the call button, and then lays back down. Id. (ch15_20181208082000.avi). At 8:23:31, Price stands up and walks to the toilet. Id. At 8:28:41, Price leaves the toilet area, returns to his sleeping area, sits down, and then lays down and covers himself with a blanket. Id. At 8:29:50, Price goes to the cell door, and then goes and speaks into the call button. Id. At 8:30:10, Price lays back down and covers himself with a blanket. Id. (ch15_20181208083000.avi). At 8:36:30, an officer opens the door and brings Price a new sleeping mat and they interact. Id. At 8:37:02, Price lays down on the

31

new mat and covers himself with the blanket while the officer leaves the cell.  Id.  From approximately 8:37 to 8:54, Price lays on the mat, occasionally adjusting his position.  Id. (ch15_20181208083000.avi to ch15_20181208085000.avi).

Notably, in his deposition, plaintiff's expert witness, Dr. McCoy, regarding the video from 8:20 to 8:30 a.m., states, *inter alia*: "I don't think [Price's] behavior is all that impressive right now.  He's walking around kind of slow."  Defs.' Reply Attach., McCoy Dep. [D.E. 90-1] at 86.  As to whether anything in that video timeframe indicates that Price is suffering from withdrawal or overdose, Dr. McCoy states, "he appears to me to be restless and agitated and that's part of withdrawal," but Price also "could be intoxicated."  Id. at 86–87.  In response to a question as to whether there was anything in the video from 8:30 to 8:40 a.m., "showing that the detention center should have provide Price with medical care during this timeframe," Dr. McCoy states: "There is not anything in that video that -- I would agree there is nothing in that video that seems to me to be a medical emergency."  Id. at 91.

When asked whether there is anything in the video from 8:40 to 8:50 that demonstrates detention officers should have provided Price medical care, Dr. McCoy responded, "not that I saw. I didn't see any evidence of a medical emergency."  Id. at 92–93.

Although Pergerson avers that Price "suffered several seizures during his withdrawal," and Price "may have seized five times before he died," Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶¶8, 13, the video evidence does not support any inference that Price suffered multiple seizures that would have been apparent to Detention Center officers or other emergency medical need before 8:54 a.m.  Indeed, Dr. McCoy noted in his deposition that, on the video between 8:40 a.m. and 8:50 a.m., "[a]t one point, [Dr. McCoy] thought [he] saw some tonic-clonic [seizure] movements

but I can't - - of course you can't tell unless you're with somebody, but it was brief and they went

away, but that's all I saw." Defs.' Reply Attach., McCoy Dep. [D.E. 90-1] at 93. Dr. McCoy

also did not note other seizure activity in the video between 8:20 and 8:54 a.m.

Then, when asked about the video from 8:50 to 8:54 a.m., whether he "had seen any visible

signs of distress up to this point," Dr. McCoy responded, "I have not." Id. at 94.

Dr. McCoy also states that vomiting "is a non-specific indication of a serious problem in

the body" and could be an indication of a drug overdose, or from food poisoning, severe stress, or

even a cardiac arrest. Id. at 111, 114. When told the video he saw was after Price had vomited

and asked whether "vomiting and then acting like that" would "indicate that [Price] was suffering

from an overdose," Dr. McCoy stated: "Well that's not enough. It is enough to conclude that he

appeared to be agitated." Id. at 114–15. As to a follow-up question, "is vomiting and then acting

the way that you saw him on the video enough to indicate an overdose," Dr. McCoy responded,

"Not enough. We need pinpoint pupils and slurred speech and all that sort of thing." Id. at 115.

Succinctly stated, the video evidence prior to 8:54 a.m. and Dr. McCoy's deposition

generally support Carter's declarations that, despite a single incident of vomiting, there was no

indication that Price was experiencing an urgent medical need that Carter or other Detention Center

officers ignored. In sum, the record evidence does not support any inference that Carter was

deliberately indifferent to Price's serious medical needs in this timeframe or otherwise acted with

a "sufficiently culpable state of mind." Mays, 992 F.3d at 300. Even under the standard

announced in Short, the record also does not support an inference that, in this timeframe, Carter

acted or failed to act "in the face of an unjustifiably high risk of harm is either known or so obvious

that it should be known." Short, 87 F.4th at 611.

As to plaintiff's deliberate indifference arguments regarding the response of Carter, Hicks, and Limerick to Price's cell at 8:54 a.m., these claims fail for the reasons discussed below.

As to Limerick, plaintiff argues, *inter alia*: that Limerick was the Sergeant on Duty when Price previously was confined at the GCDC and was placed on withdrawal protocol; despite the fact that Price was a known heroin addict, Limerick did not assign Price to withdrawal protocol on this occasion; Limerick "is not entitled to rely on Price's denial that he had taken heroin that day"; "inmates in the 10-man cell attribute the comment that Price 'just needs another fix. He'll be fine,' at the time when Price was experiencing seizures"; "Limerick admits that she failed to inform Nurse Varnadore in their one and only telephone communication that Price had suffered a seizure"; Limerick "told EMS that Price 'was in and out all night,' which shows that she did in fact know that Price was *in extremis*"; and that the "trier of fact may conclude that at the point that Price was either dead or nearly dead, her obduracy and wantonness finally abated, and she informed EMS what she had known all along about Price's condition, in hopes that somehow he could be revived." Pl.'s Mem. [D.E. 85] at 8–9. In support of his contention the court should apply the <u>Short</u> standard, plaintiff argues, *inter alia*: Price alerted Limerick at intake that he was taking ten bindles of heroin daily; Limerick knew the level of Price's drug habit at initial screening and had previous experience with Price "withdrawing on her watch"; when Price "began to experience the final agonies of seizures and death, Limerick and Carter were present and merely laughed at him, saying that all he needed was another fix," and that Limerick "did not contact the nurse until after the medical attention was useless because Price had suffered and agonizing death." Pl.'s Sup. Br. [D.E. 99] at 9–11. Plaintiff further contends that these incidents show that Limerick, among others, recognized that Price required medical attention, "drew the inference that something must

34

be done, yet purposefully and intentionally refused to take any reasonable measures to get [Price] the medical attention he required" such that, as to these defendants, "plaintiff has met the more stringent subjective standard that prevailed in the Fourth Circuit before Kingsley." Id. at 11–12.

As to plaintiff's claims regarding Price's intake at the Detention Center on December 7, 2018, Limerick declares, *inter alia*: Limerick visually inspected Price at the time of his admission; Price and "did not perceive that Mr. Price had any need of immediate medical care or mental health care when he arrived" or "observe any specific conditions or behaviors that indicated that immediate medical treatment was necessary"; Limerick "did not see any signs of severe intoxication or other serious medical condition"; Price "denied having taken substances" and "also denied suffering from withdrawal"; Price "did not express concerns about overdosing or otherwise show symptoms of an overdose upon" arrival at the Detention Center; Price "did not exhibit any symptoms of severe withdrawal or severe overdose, including any noticeable sweating, audible groans, dizziness, lack of consciousness or semi-consciousness, or any other symptoms that indicated to [Limerick] that he was withdrawing or suffering an overdose"; and Limerick "did not see any need for Mr. Price to be housed in medical or observation quarters." Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶¶19–23, 25–29.

The body-cam video of Price's arrest shortly before his transportation to the Detention Center shows Price conversing with, and answering the questions of the arresting officer, Harrison. See Defs.' App., Ex. 6. This video evidence generally supports the declarations of Limerick and Harrison that Price did not seem "high" or severely intoxicated at the time of his arrest, see id., Ex. 5, Harrison Decl. [D.E. 74-5] at ¶¶15–16, and that Price was neither severely intoxicated nor experiencing severe withdrawal symptoms at the time of admission to the GCDC, see id., Ex. 1,

35

Limerick Decl. [D.E. 74-1] at ¶¶20–22. This video evidence also belies the somewhat contradictory averments of Pergerson and Wyche – that it was "obvious" Price was "high" on opioids when admitted, Pl.'s Ex. 8, Pergerson Aff. [D.E. 86-9] at ¶¶2–3, and that "Price came in dope sick, withdrawing from heroin" and that "[t]he jailers knew as well as anyone that Chad Price was going through withdrawal," id., Ex. 9, Wyche Aff. [D.E. 86-10] at ¶3.

As to plaintiff's claims regarding Price's "final agonies of seizures and death," Limerick declares, *inter alia*: when Price "began what appeared to be a severe seizure, his cellmates immediately notified [Detention Center] staff via the emergency call button, and [Detention Center] officers arrived at the cellblock promptly"; "Hicks called over the radio reporting Price was having a seizure; Limerick, Hicks, and Carter responded to the cell; "Not even one minute had passed by from the time Mr. Price began experiencing a seizure, the time inmates pressed the call button, and the time [Detention Center] officers arrived to Mr. Price's aid [sic]"; when Limerick arrived at the cell, "Price was lying on his side with saliva coming from the side of his mouth"; and Limerick "instructed Sgt. Carter to get the wheelchair so that [they] could get Price to the nurses' station to be checked." Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶¶40–41.

The relevant video evidence shows that: from 8:50 a.m. to 8:54:07 a.m. Price is lying relatively still on a mat next to the door; at 8:54:08 a.m., Price has a severe seizure, rocking from side to side; at 8:54:17 a.m. Price rolls off the mat convulsing, with arms flailing; at approximately 8:54:26 a.m., inmates see Price and begin to respond; at approximately 8:54:33 a.m., an inmate presses the call button; at 8:55:04 a.m. the first officer, presumably Hicks, arrives at the cell, speaks to an inmate briefly, looks where Price is laying and walks toward his head; at 8:55:26 a.m., a second officer, presumably Limerick, arrives and walks toward Price's head; at 8:55:34 a.m., a

36

third officer, presumably Carter, arrives with a trustee respond to the cell; at 8:55:48 a.m., Limerick speaks to Carter who immediately leaves the cell; from 8:55:51 a.m. to 8:56:30 a.m., one or both of the officers is leaning over Price; at 8:56:36 a.m., the trustee bends over and moves Price somewhat; at 8:56:54 a.m., an officer, presumably Limerick, walks away from Price and speaks to other inmates while the trustee and the other officer, presumably Hicks, continue watching Price; at 8:57:15 a.m., Limerick returns near Price's head as the trustee begins to lift Price; at 8:57:22 a.m., Carter returns with a wheelchair and the trustee lifts Price into the wheelchair; by 8:57:48 a.m., Price has been wheeled out of the room and the officers have all exited. See Defs.' App., Ex. 7 (ch15_20181208085000.avi).

This video evidence supports Limerick's averment that the officers responded promptly to the cell once inmates pressed the call button and alerted staff to Price's apparent seizure. The video, however, belies the contrary averments of Whyche and Pergerson that the officer's response was dilatory. See Pl.'s Ex. 9, Wyche Aff. [D.E. 86-10] at ¶13 (averring there was "a delay" before the officers responded); id., Ex. 8 Pergerson Aff. [D.E. 86-9] at ¶¶12–15 (averring that Price "had a serious seizure. Other inmates called for help, but still no help was forthcoming.").

Notably, in his deposition, plaintiff's expert witness, Dr. McCoy, acknowledged, in response to a question regarding his opinion on the response time of the detention officers:

> it's the only time I've seen detention officers respond so fast when somebody pushed a button for them to come, but it seems like they came vary rapid. Even in a hospital or a nursing home it's hard. Sometimes you get a nurse in a timely manner. But I don't know what he said, but he said something that seemed to alarm the other inmates and they started taking action.

Defs.' Reply Attach., McCoy Dep. [D.E. 90-1] at 95.

37

When asked whether the detention officers' response time was adequate, Dr. Price said, "Yes, seemed to me that it was." Id. at 96.

Although plaintiff faults Limerick and the responding officers for their failure to provide first aid to Price, including Naloxone, see Compl. [D.E. 1] at ¶¶47–48, Limerick declares: Limerick "did not personally believe that Naloxone or Narcan was necessary" because Limerick "personally believed that Mr. Price was suffering from a severe withdrawal rather than an overdose"; Limerick "had no reason to believe that Mr. Price could have ingested substances while at the [Detention Center] or otherwise would have been suffering from an overdose"; "since Naloxone or Narcan are used for overdoses and not withdrawals, [Limerick] did not believe Naloxone/Narcan was necessary." See Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶¶45–47.

There is no showing that Limerick or other responding officers were aware that Price was suffering from an overdose, and both expert witnesses agree that administering Naloxone to an individual suffering from opioid withdrawal, instead of an overdose, can cause negative effects. See id., Ex. 13 [D.E. 74-12] at 9, 11 (Hime, opining, inter alia, that: Naloxone "is an opioid antagonist" that is "used to block the toxic effects of morphine and reverse the lethal symptoms like respiratory depression"; "Naloxone is not meant to be used for addicts suffering from withdrawal"; "It also is understandable why Price was not administered naloxone by GCDC personnel until the EMS arrived since they were better able to assess his condition and take more appropriate action without further exacerbating his condition. Unaware of what was causing his seizures[,] their hesitance was foreseeable. In fact, if they had proceeded in administering naloxone without knowing he was overdosing they may have hastened his death."); Defs.' Reply Attach., McCoy Dep. [D.E. 90-1] at 72 (Dr. McCoy, responding "yes," as to whether it would be

38

dangerous to administer Narcan when someone is suffering from withdrawal, and elaborating, "Narcan is for overdoses. Some people have unwisely been given Narcan when the still had lots of opiate on board [sic] and it's caused terrible reaction. The person feels absolutely horrible, and it's a mistake.").

The court presumes, without deciding, that, when responding to the cell after Price's seizure circa 8:54 a.m., Limerick laughed at Price and stated, "he just needs another fix" and "he'll be fine." Under a deliberate indifference analysis, these purported statements reflect that Limerick did not subjectively believe that Price was near death but instead mistakenly believed that Price was merely experiencing non-fatal drug withdrawal. Moreover, contemporaneous to these purported statements and laughter, as noted above, the video evidence plainly depicts Limerick and the responding the officers rapidly entering the cell, bending over to check on Price, sending Carter to get a wheelchair, continuing to stand near Price and examine him, assisting a trustee placing Price in a wheelchair, and removing Price from the cell within three minutes of their arrival in the cell. Thus, despite Limerick's purported subjectively harsh words, the video reflects that as to their response to the cell circa 8:54 a.m., Limerick and the other responding defendants objectively took prompt, reasonable ameliorative actions, and did not fail to act "in the face of an unjustifiably high risk of harm is either known or so obvious that it should be known." Short, 87 F.4th at 611; see Farmer, 511 U.S. at 844 (finding an official "who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [she] responded reasonably to the risk, even if the harm ultimately was not averted."); Whitley v. Albers, 475 U.S. 312, 319 (1986) (noting it is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."),

39

abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); Henslee v. Lewis, 153 F. App'x 178, 180 (4th Cir. 2005) (per curiam) (unpublished) ("Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983." (citing Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979))); see also Brown v. Middleton, 362 F. App'x 340, 344 (4th Cir. 2010) (per curiam) (unpublished) (finding no triable issue of fact concerning whether arresting officers knew an arrestee was in need of urgent medical attention where the arrestee denied having swallowed drugs and acted normally in the hours before he suffered a series of seizures and died pursuant to acute cocaine intoxication).

The court now turns to plaintiff's contentions that Limerick "did not contact the nurse until after the medical attention was useless," Limerick failed to inform the nurse about plaintiff's seizure, and that Limerick's statement to the EMS – that Price was "in and out all night" indicated that Limerick knew that Price was "*in extremis*," yet had failed to act.

Limerick declares, *inter alia*: after transporting Price from the cell in a wheelchair to the nurse's station, Limerick checked Price's vitals and reported a blood pressure of 103/77; Limerick contacted part-time nurse, Diane Varnadore via telephone "and reported that Price was in the nurses' station with nausea and vomiting and appeared to be semi-conscious"; the nurse advised Limerick to call 911 and have Price transported by EMS to the hospital; at approximately 9:01 a.m., six minutes after arriving at Price's cell, Limerick called EMS and advised that she had an inmate who was believed to be suffering a seizure or possibly withdrawal; the dispatcher asked whether Price was conscious and whether he was breathing, and Limerick confirmed that Price was both conscious and breathing at that time; Limerick "continued to talk to Price saying[,] 'Stay with me, Chad,' rubbing his chest.   His head was dropping[,] and he appeared to be going in and

40

out of consciousness"; because Limerick "perceived that Mr. Price was conscious and breathing and knew that EMS was arriving promptly, [Limerick] did not believe it was necessary to perform CPR," but Limerick "would have done so without hesitation" if Limerick "had been instructed to do so by the nurse or dispatcher"; and that EMS arrived at the Detention Center circa 9:05 a.m. Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶¶42–48. Carter declares: "I stayed at the nurse's station with [ ] Limerick as she checked his vitals and placed a call to our part-time nurse, then called EMS as instructed by the nurse." Id., Ex. 8, Carter Decl. [D.E. 74-8] at ¶6.

Contra plaintiff's argument, the EMS record reflects, "Guards stated that 'he was in and out all *day* long,'" not "all night long" See Pl.'s Ex. 3 [D.E. 86-4] at 5 (emphasis added). The record of the 911 call also generally supports Limerick's declaration. See Defs.' App., Ex. 11 (stating that Price was "slobbering out of the mouth," non-responsive, undergoing possible drug withdrawal, but still breathing). Moreover, as discussed above, the video evidence does not show Price experiencing a medical emergency until 8:54 a.m. See, generally, See Defs.' App., Ex. 7.

In light of Limerick's uncontroverted attempts to seek prompt medical attention for Price after the 8:54 a.m. medical emergency, the exact cause of which was unknown to officers, plaintiff's contention that Limerick waited until it was too late to save Price and otherwise failed to properly inform the medical staff as to the severity of Price's symptoms amounts to claims of negligence, or accidental failure "to do right by the detainee." Short, 87 F.4th at 611–12.

In sum, the record does not support an inference that Limerick actions – booking Price to the Detention Center when Limerick did not perceive that Price was either high or withdrawing, responding to Price's cell circa 8:54 a.m., or contacting the nurse and EMS promptly thereafter – entailed either a "sufficiently culpable state of mind," Mays, 992 F.3d at 300, or a failure to act "in

41

the face of an unjustifiably high risk of harm is either known or so obvious that it should be known"
or otherwise were objectively unreasonable, cf. Short, 87 F.4th at 611.

As to the remaining individual defendants, plaintiff argues that none of the other officers
on shift during Price's detention on December 7-8, 2018, "have offered any justification for their
failure to respond to the many calls for assistance from the 10-man cell, or their heedlessness to
the commotion described by Pergerson and Wyche that is of such character and degree that none
of them could simply stand by to witness Price's agonies without being deliberately indifferent to
the suffering and his obvious need for medical attention."   Pl.'s Mem. [D.E. 85] at 10–11.

Defendants, however, have demonstrated that there is an absence of evidence to support
viable § 1983 claims against Evans, Steven Hayes, Harold Woody, Lamont, Wade Woody,
Robinson, and Benson.   Celotex, 477 U.S. at 325; see Iqbal, 556 U.S. at 676; Short, 87 F.4th at
611; Wright, 766 F.2d at 850; Randall, 302 F.3d at 204.   As to these defendants, plaintiff merely
rests upon the allegations in the complaint, cf. Anderson, 477 U.S. at 248–49, and fails to "come
forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at
587 (emphasis and quotation omitted).

Further, because, as noted above, there is no showing that any individual defendant was
either deliberately indifferent to Price's serious medical needs or that their actions or inactions
were objectively unreasonable under Short, plaintiff likewise fails to demonstrate that any
defendant satisfies the operative test for a bystander liability claim.   See Randall v. Prince
George's Cnty., Md., 302 F.3d 188, 204 (4th Cir. 2002) (requiring the officer: "(1) knows that a
fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to
prevent the harm; and (3) chooses not to act.").

42

In sum after reviewing the evidence and reasonable inferences in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have met their burden of showing the absence of a genuine issue of material fact as to plaintiff's claims against the individual defendants, see Celotex, 477 U.S. at 325, but plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted).  Thus, the individual defendants are entitled to summary judgment.  Anderson, 477 U.S. at 249; Matsushita, 475 U.S. at 587 (finding summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." (citation omitted)).

Alternatively, as government officials, defendants are entitled to qualified immunity from civil damages if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In other words, defendants are entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct.  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

As noted above, Short announces a new standard for pretrial detainee claims of deliberate indifference in the Fourth Circuit.  At the time the events in question occurred, such claims, like those of convicted prisoners, required a subjective showing that the official acted with a "sufficiently culpable state of mind," Mays, 992 F.3d at 300, such that the Short standard was not

43

"clearly established," cf. Callahan, 555 U.S. at 236. Because, as noted above, plaintiff fails to show any individual defendant acted with a culpable state of mind, reasonable officers in defendants' positions would not have recognized that their actions violated plaintiff's clearly established constitutional rights. See Ashcroft, 563 U.S. at 743 ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" (citation omitted)). Thus, the individual defendants also are entitled to a finding of qualified immunity.

2) Plaintiff's official capacity and Monell claims:

In his first claim for relief premised on Monell, plaintiff alleges, *inter alia*: the Detention Center medical plan does not provide a detailed standard of care for severely intoxicated arrestees; Granville County and the Granville County Sheriff exhibited deliberate indifference to inmates suffering from substance abuse disorder when they refused "to implement any meaningful procedures and protocols for addressing the everyday issue of substance use disorder"; "reasonable and cost-effective measures are available to provide a humane experience of withdrawal, including medication"; "[i]t is the policy, custom or practice of Granville County Detention Center to provide no service of any kind to inmates known to be suffering from withdrawal, including withdrawal in such life-threatening severity, such as that experienced by Price"; "unsupervised withdrawal . . . is the affirmative policy of Granville County and Granville County Sheriff"; withholding medical treatment to inmates in withdrawal constitutes cruel and unusual punishment; "[a]s a result of these policies, practices and customs, Price suffered torment, severe emotional distress, unnecessary suffering and other distress for many hours before his death at their hands"; "upon reason and belief, the Sheriffs and Granville County have made inadequate provision for training of detention

44

center personnel"; Detention Center medical resources are "grossly inadequate" as a doctor provides once-a-week medical services and a nurse visits two times a week, but the nurse did not "speak with Price or with any detention personnel concerning Price's serious medical condition at all, until after Price had already lost consciousness and it was far too late for medical intervention to prevent his untimely death [sic]"; "Granville County and Granville County Sheriffs do not provide medical consultation for inmates suffering from opioid use disorder, withdrawal, or even symptoms of extremely serious medical distress such as seizures suffered by Price"; and "Granville County and Wilkins deliberately withheld medical attention for persons who suffer from substance use disorder . . . motivated by contempt and deliberate indifference to the suffering for these individuals and have done so for many years."  See Compl. [D.E. 1] at ¶¶55–76.

Plaintiff's official capacity claims in the second claim for relief allege that the Sheriff and unspecified officer defendants "failed and refused to perform their oversight and policy-making duties," that detainee medical care deprivations at the Detention Center were widespread and commonplace, and the environment created by these defendants at the Detention Center "is the proximate cause of the injuries, suffering, death, and damages suffered by Price."  Id. at ¶¶77–87.

Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.  Kentucky v. Graham, 473 U.S. 159, 165 (1985).  A county or municipality, however, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents"; instead, liability may be found only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Monell, 436 U.S. at 694; see Connick v. Thompson, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a

45

government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 402 (4th Cir. 2014) ("Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the sine qua non of Monell liability.").

> [a] policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Starbuck v. Williamsburg James City Cty. Sch. Bd., No. 20-2334, 2022 WL 774732, at *2 (4th Cir. Mar. 15, 2022) (quoting Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003)).

In opposition to defendants' motion for summary judgment, plaintiff generally argues there was a failure to update Detention Center medical policies in light of the "opioid crisis," opioid withdrawal is a serious medical condition that should be monitored by medical professionals, Granville County was aware of the "opioid crisis" for years and a jury may conclude that the county was deliberately indifferent "to the plight of victims of the opioid epidemic" by failing to update the medical policy, the policy itself does not mention opioids or opioid withdrawal protocol, and medical staffing at the Detention Center was lacking.    See Pl.'s Mem. [D.E. 85] at 12–15.

The court has reviewed the Detention Center medical plan and policies attached to the complaint which provide for both routine and emergency healthcare with medical professionals. See Compl. Attach., Pl. Ex. 5, [D.E. 1-6] at 2–42.    These plans specifically include provisions for training for Detention Center staff on "[s]igns of unconsciousness or semi-consciousness," "[s]igns of alcohol and drug intoxication," and "[s]igns/symptoms of severe pain," id. at 13, and plans for "Detention officers [to] provide routine and emergency medical services to inmates suffering from

46

severe drug and/or alcohol intoxication or the effects thereof," id. at 20. Thus, delaying or denying medical treatment for Detention Center inmates suffering serious symptoms of intoxication or withdrawal is not an "express policy." Cf. Lytle, 326 F.3d at 471.

Moreover, plaintiff's allegation that it was the policy or custom "to provide no service of any kind to inmates known to be suffering from withdrawal" is belied by various Detention Center medical records indicating that Price previously received treatment for heroin withdrawal on May 17, 2018, the day following his admission to the Detention Center on May 16, 2018, see Pl.'s Ex. 10 [D.E. 86-11] at 2, a notation regarding "withdrawal protocol" on May 24, 2018, in response to Price's submission of a sick call form on May 23, 2018, see id. at 5 (noting medical provider's impression of "opioid dependent – withdrawal protocol given now c/o generalized pain"), and a notation regarding "detox" on June 4, 2018, following Price's submission of a sick call request to transfer medication from Person County Jail on that same date, see id. at 6.

To the extent plaintiff argues municipal liability is appropriate for a "failure to supervise and train," see Compl. [D.E. 1] at ¶67, "a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse." Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir. 1983); see also Connick, 563 U.S. at 61 (noting: "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." (citations omitted)). Moreover, "[a] single act or isolated incidents normally are insufficient to establish supervisory inaction upon which to predicate § 1983 liability." Wellington, 717 F.2d at 936 (footnote omitted).

Plaintiff does not contest defendants' statement–that from at least 2012 to the date of Mr. Price's incident, the GCDC did not have any incidents of opioid-related deaths whatsoever, see

47

Defs.' Stmt. Mat. Facts [D.E. 73] at ¶21, Limerick's supporting declarations that, during that timeframe, incidents of inmate opioid overdoses or severe withdrawals were not commonplace in the GCDC, see Defs.' App., Ex. 1, Limerick Decl. [D.E. 74-1] at ¶5, Robertson's declaration that: "from at least 2012 to the date of the Mr. Price incident, GCDC did not have any incidents of opioid-related deaths whatsoever. There was no pattern or widespread practice of allowing for such incidents to occur at any time leading up to Mr. Price's unanticipated and sudden overdose," id., Ex. 2, Robertson Decl. [D.E. 74-2] at ¶26, or May's declaration that: "Leading up to the December 2018 incident, from at least 2012, Granville County was not informed of any deaths by overdose or severe withdrawal occurring at the GCDC," id., Ex. 4, May Decl. [D.E. 74-4] at ¶5.

Here, particularly where plaintiff argues about Detention Center drug withdrawal policies and protocol, but Price's cause of death was a fentanyl overdose, plaintiff fails to demonstrate the policies in question were unconstitutional, or that there was a pattern of violation harm to Price that was condoned. See, e.g., Connick, 563 U.S. at 63, n.7 ("contemporaneous . . . conduct cannot establish a pattern of violations" necessary to establish a deficient training claim); City of Oklahoma v. Tuttle, 471 U.S. 808, 823–24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." (footnotes omitted)); Owens, 767 F.3d at

48

402 (requiring, under a "condonation" theory, a municipality's "failure to put a stop to or correct a widespread pattern of unconstitutional conduct"); Lytle, 326 F.3d at 472 ("A 'final policymaker' for the purposes of municipal liability is someone who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.' A local government may be held liable for a decision made by an individual 'whose edicts or acts may fairly be said to represent official policy.' However, merely 'going along with the discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy.'" (internal citations omitted)); Semple v. City of Moundsville, 195 F.3d 708, 713–14 (4th Cir. 1999) (noting "a plaintiff must establish a direct causal connection between specific deficiencies and a specific injury," and that "proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom" (citations omitted)); Jones v. Wellham, 104 F.3d 620, 627 (4th Cir. 1997) ("The causation requirement for imposing municipal liability for policy maker decisions not themselves unconstitutional is a stringent one deriving from the necessity to avoid the effective, but forbidden, imposition of vicarious liability on municipalities." (citations omitted)); Simons v. Montgomery Cnty. Police Officers, 762 F.2d 30, 34 (4th Cir. 1985) ("there can be no liability under § 1983 either under respondeat superior, or for negligence in training, supervising or controlling subordinates, based simply on an isolated instance of wrongdoing" (internal citations omitted); Wellington, 717 F.2d at 936.

After viewing the evidence and inferences in the light most favorable to plaintiff, see Scott, 550 U.S. at 378, defendants have met their burden of showing the absence of evidence to support plaintiff's official capacity and municipal liability claims, whereas plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587

49

(emphasis and quotation omitted). Thus, defendants are entitled to summary judgment on these claims. Anderson, 477 U.S. at 249; Matsushita, 475 U.S. at 587 (finding summary judgment is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." (citation omitted)).

    3) Plaintiff's remaining state-law claims:

Finally, because defendant is entitled to summary judgment and dismissal of plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over his state-law claims, including against Western Surety. See 28 U.S.C. § 1367(c)(3) (granting district courts discretion to decline to exercises supplemental jurisdiction over a pendent state-law claim where the court has dismissed all claims over which it has original jurisdiction); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (noting "pendent jurisdiction is a doctrine of jurisdictional discretion" and that, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well"); Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) (holding the district court possesses "inherent power to dismiss the case . . . provided the conditions set forth in § 1367(c) for declining to exercise supplemental jurisdiction have been met"); see also Gantt v. Whitaker, 203 F. Supp. 2d 503, 512 (M.D.N.C. 2002) (declining to exercise supplemental jurisdiction over plaintiff's state law claims including those again the sheriff's official bond), aff'd, 57 F. App'x 141 (4th Cir. 2003); McGill v. McVicker, No. 5:16-CT-3031-FL, 2018 WL 4621900, at *4 (E.D.N.C. Sept. 26, 2018).

Conclusion:

In sum, the court GRANTS the motion for summary judgment [D.E. 72]. The court DISMISSES plaintiff's federal claims and DISMISSES WITHOUT PREJUDICE plaintiff's state-law claims. The clerk shall close the case.

SO ORDERED this 29th day of March 2024.

Richard E Myers II<br>
RICHARD E. MYERS II<br>
Chief United States District Judge